AO 106 (Rev. 04/10) Application for a Search Warrant

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

JUL 3 0 2018 

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 18mr669
The Google, LLC account associated with phone number )
505-582-4555 and/or IMEI: 865882032515558 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of ___New Mexico___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Secs. 1201(a), 2119, 1951(a), 371, and 2(a) and (b). | kidnapping, carjacking, interference with commerce by threats or violence, conspriacy, and aiding and abetting. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet. *from the date the warrant is served - SCY*

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ross Zuercher, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___07/30/2018___

*Judge's signature*

City and state: ___Albuquerque, New Mexico___   Steven C. Yarbrough
*Printed name and title*

## AFFIDAVIT

Your Affiant, Ross Zuercher, having been duly sworn, does hereby depose and say:

### Introduction

1. I have been a Special Agent (SA) of the Federal Bureau of Investigation (FBI), United States Department of Justice, since August 2012. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request search warrants. I am currently assigned to the FBI's Albuquerque Violent Crime Program, as such, I am authorized to investigate kidnappings. The information set forth in this affidavit was derived from my own investigation and/or communicated to me by other sworn law enforcement officers of the FBI, New Mexico Probation and Parole, and the Albuquerque Police Department (APD). Because this affidavit is submitted for the limited purpose of securing a search warrant, your Affiant has not included each and every fact known to me concerning this investigation. Your Affiant has set forth only those facts that your Affiant believes are necessary to establish probable cause to support a search warrant for the Google Account more fully described in Attachment A for the items more fully described in Attachment B of this affidavit.

### Request for Sealing

2. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, affidavit, and search warrant. Your Affiant believes that sealing these documents is necessary to protect the integrity of the case because the item to be searched is relevant to an ongoing investigation.

### Relevant Statutes

3. This investigation concerns alleged violations of certain activities relating to kidnapping, carjacking, interference with commerce by threats of violence, conspiracy and aiding and abetting pursuant to Title 18 U.S.C. §§ 1201(a), 2119, 1951(a), 371, and 2(a) and (b).

    a. <u>Kidnapping</u>: 18 U.S.C. § 1201(a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when—
        i. the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of

1

        interstate or foreign commerce in committing or in furtherance of the commission of the offense;

b. <u>Carjacking</u>: 18 U.S.C. § 2119 - Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so.

c. <u>Interference with Commerce by Threats or Violence (Hobbs Act)</u>: 18 U.S.C. § 1951(a), whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section.

d. <u>Conspiracy</u>: 18 U.S.C. § 371 - two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy.

e. <u>Aiding and Abetting</u>: 18 U.S.C. § 2 –

    i. (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    ii. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## Jurisdiction

4. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## Details of the Investigation

5. On July 26, 2018, at approximately 6:00 a.m., a 69-year-old male victim, D.M., a resident of Placitas, New Mexico, exited his residence through his garage and prepared to travel to work in his red 2004 Ford Ranger. D.M. is the owner of a business that has locations in Albuquerque and Santa Fe, New Mexico.

2

6. As D.M. entered his vehicle, an unknown male subject (SUBJECT 1) wrapped his armed around D.M.'s neck and covered D.M.'s mouth. D.M. started to struggle with SUBJECT 1 and observed a second male (SUBJECT 2) approach with a firearm in his hand. D.M. observed both SUBJECTS to have stocking caps on their heads and blue bandanas over their faces. While D.M. struggled to break free of SUBJECT 1's grip, SUBJECT 2 approached and struck D.M. in the face several times with a pistol. During the struggle, D.M. realized a stub-nosed revolver had fallen to the ground and D.M. was able to retrieve the firearm. D.M. pointed the gun at one of the SUBJECTS and pulled the trigger several times; however, the revolver did not fire. D.M. then realized the other SUBJECT was armed with a semi-automatic pistol and fearing that he might be shot, D.M. stopped fighting and complied with the SUBJECTS. The SUBJECTS forced D.M. into the middle seat of his Ford Ranger and placed a shirt over his head to obstruct his vision. D.M. was seated between the two SUBJECTS and all three men departed the residence.[1]

7. D.M. indicated the SUBJECTS knew him by his first name and they told D.M. they knew him to have two safes[2] and the SUBJECTS believed him to have a significant amount of money in the bank. The SUBJECTS demanded D.M. pay them $50,000. D.M. convinced the SUBJECTS that he did not have $50,000, but could come up with $10,000. The SUBJECTS took D.M.'s cell phone and wallet. They removed $600 from D.M.'s wallet.

8. After departing the residence, the SUBJECTS drove north on I-25 for several miles and stopped at a remote location. The SUBJECTS tied D.M.'s hands and feet with tie-downs and placed him in the bed of his Ford Ranger. The SUBJECTS removed items from the bed of the truck to create room for D.M.[3] The SUBJECTS made D.M. lay down in the bed of the truck and covered his body with carpet and other items. The SUBJECTS then drove D.M. around for some time. While being driven around, D.M. was able to see under or through an opening in his face covering and caught a glimpse of a restaurant sign in Bernalillo, New Mexico, that D.M. was familiar with. D.M. later observed a Loves Travel Stop and Burger King restaurant, which were co-located together. I believe the Loves/Burger King to be located on Central Avenue SW and Atrisco Vista Boulevard (just south of Interstate 40). The trio arrived at an unknown location shortly thereafter and D.M was placed in a shed-like structure, on a couch. D.M. remained blind-folded, but heard SUBJECT 1 and SUBJECT 2 interact with two females. D.M. described all of the people as speaking Spanish.

9. D.M. was able to loosen his blindfold over time and observed the SUBJECTS cover his Ford Ranger with a gray car cover, and place a piece of wood over the tarp to keep it in place.

---

[1] FBI Special Agents who reviewed surveillance video footage from a neighborhood camera told me the red Ford Ranger can be seen departing D.M.'s residence in the morning; however, it appeared only one person was inside the truck.

[2] D.M. confirmed with FBI Special Agents that he did possess two storage safes.

[3] FBI Special Agents subsequently recovered the items removed from D.M.'s truck. The recovery was made possible once agents began tracking the TARGET TELEPHONE.

3

10. The SUBJECTS had D.M. call his daughter, J.L., with a provided phone and provided D.M. with instructions on where to wire transfer $9,400 ($10,000-$600). The call was made first by entering a code to block the end user from seeing the calling phone number, and then by dialing the number for J.L. The funds were to be sent to a specific account at a bank in Guadalajara, Mexico. D.M. called J.L. several times regarding the wire transfer, as the bank routing information was not sufficient to complete the transfer. During one of the conversations, J.L. spoke with one of the SUBJECTS about the pending wire transfer. The SUBJECT informed J.L. that "$30,000 can be deposited in that account no problem" and questioned why J.L was having problems sending $10,000. J.L. explained the bank required additional information because the transfer was being sent international. The SUBJECT suggested J.L. just get cash and they could meet in the downtown Albuquerque area. J.L was able to record a total of four calls with D.M. and the SUBJECT. Special Agent (SA) Bryan Acee reviewed those recordings.

11. The FBI obtained call detail records for J.L.'s cell phone and determined the SUBJECTS' telephone number to be 505-582-4555 (TARGET TELEPHONE). Your Affiant confirmed the TARGET TELEPHONE to utilize T-Mobile US, Inc cellular service. The subscriber on the account was listed as JOSE RAMIREZ, with the address 10317 Jenaro Street SW, Albuquerque, New Mexico (LOCATION 1). T-Mobile's records indicated RAMIREZ activated the account on July 3, 2018. Further, an International Mobile Equipment Identity (IMEI) number was ascertained from the call detail records as: 865882032515558. The subscriber information from T-Mobile further elaborated that the device using the aforementioned cellular number and IMEI was a ZTE Z855, a smartphone that utilizes the Google Android operating system.

12. A review of FBI databases indicated RAMIREZ was on active parole with the New Mexico Corrections Department (NMCD) for a conviction of aggravated battery against a household member and being a felon in possession of a firearm. RAMIREZ' criminal history (FBI #199073FB8) indicated he had prior federal convictions for 8 U.S.C. § 1324 - alien smuggling (1999) and 21 U.S.C. § 841(A)(1) -possession with intent to distribute marijuana (2001). RAMIREZ' records also reflect a felony conviction for forgery in Arizona (1997).

13. RAMIREZ' residence of record with NMCD was listed as 10301 Jenaro Street SW, Albuquerque, New Mexico (LOCATION 2).

14. During the evening hours of July 26, 2018, SA Acee spoke with RAMIREZ' NMCD parole officer, Rebekah Wells, who provided additional information on RAMIREZ. SA Acee learned RAMIREZ was required to wear a GPS ankle monitoring device as a condition of his parole. Officer Wells told SA Acee that RAMIREZ cut the device off on the evening of July 25, 2018 and NMCD officers recovered the damaged GPS device at LOCATION 2 on the morning of July 26, 2018. NMCD then issued an arrest warrant for RAMIREZ for parole violations, which remains active as of the submission of this complaint.

15. SA Acee asked Officer Wells to listen to the telephone call J.L had with one of the SUBJECTS earlier in the day. After listening to the call, Officer Wells informed SA Acee that the SUBJECT sounded like RAMIREZ and she was 80-90% sure the SUBJECT was RAMIREZ.

16. Officer Wells provided SA Acee with RAMIREZ' telephone number, which was the same as the TARGET TELEPHONE. Officer Wells sent SA Acee a recent voicemail from RAMIREZ to Officer Wells, in which RAMIREZ indicated he was going to be out past his curfew and indicated he was at 2nd and Rio Bravo, in Albuquerque. RAMIREZ asked Officer Wells to call him back on the TARGET TELEPHONE.

17. After listening to the voicemail, SA Acee believed the SUBJECT and RAMIREZ to be the same person, based on similarities in their voices, accent, and speech pattern. SA Acee also noted both men spoke with an apparent stutter. Officer Wells told SA Acee that RAMIREZ often stuttered when speaking with her.

### Victim Located

18. At approximately 10:45 p.m., D.M. was dropped off near the train tracks at Rio Bravo SW and 2nd Street SW, in Albuquerque, New Mexico. D.M. removed a shirt that had been placed over his head and walked to the nearby Giant gas station, located at 201 Rio Bravo Boulevard SW, Albuquerque, New Mexico. Store clerks at the Giant called 911 and the Bernalillo County Sheriff's Office and paramedics responded to the location.

19. SA Acee arrived at the location a few minutes later and briefly spoke with D.M., who was in the back of an ambulance. D.M.'s face and clothing were covered in blood. D.M. was transported to an Albuquerque hospital and provided with medical treatment.

20. Your Affiant and SA Thad Clancy met D.M. and his family members at the hospital. D.M. provided a detailed statement to SAs Zuercher and Clancy. D.M. was shown a photo array that included RAMIREZ; however, D.M. did not initially recognize RAMIREZ. While viewing the photos (one at a time) D.M. used his hands to mask, or cover-up, the majority of the photo – only exposing the area around the person's eyes. D.M. did not recognize any of the people in the photo array. Agents later asked D.M. if he knew anyone named JOSE RAMIREZ. D.M. said he had a former employee named JOSE RAMIREZ, who had worked for him for about four years before D.M. subsequently fired RAMIREZ for theft. SA Zuercher showed D.M. a photo of RAMIREZ and D.M. immediately recognized the person in the photo as being the same RAMIREZ who had previously worked for him. D.M. told agents one of the SUBJECTS (the taller of the two) was built like RAMIREZ and his voice sounded like RAMIREZ. RAMIREZ had worked for D.M. approximately nine years prior.

21. D.M. stated that the subject who matches the description for RAMIREZ told him that they extorted a different family the day prior for $30,000.

22. Other FBI agents met with NMCD fugitive investigators and formulated a plan to visit LOCATIONS 1 and 2 in an attempt to locate and arrest RAMIREZ on his state parole warrant.

23. FBI and NMCD fugitive investigators made contact with RAMIREZ' family members at LOCATIONS 1 and 2. RAMIREZ' family members were cooperative, but unable to provide investigators with any meaningful leads on RAMIREZ' whereabouts. FBI agents assisted NMCD officers in searching the locations; however, RAMIREZ was not located.

24. Your Affiant knows that a majority of the population has a cell phone in the United States.

25. Your Affiant knows that a majority of cell phone users in the United States own smartphones.

26. Your affiant knows that of all smartphones, a large majority use software operating systems from Apple and Google. They are named iOS (Apple) and Android (Google). As of early 2017, Google's Android operating system had over 87% of the market share of phone operating systems in the United States.

27. Your Affiant knows that there are four cell phone carriers in the country that own a vast majority of working cell phone towers. Those carriers are AT&T, Sprint, T-Mobile and Verizon Wireless.

28. Your Affiant knows that cell phone carriers keep records of the make, model and unique identifiers of every cell phone that uses their cell towers.

29. Your Affiant knows that one of the most common unique identifiers on a cell phone is the International Mobile Equipment Identifier (IMEI).

30. Your Affiant knows that when a smartphone using the Android operating system is activated, a user is asked to login with a Google owned email address, like example@gmail.com.

31. Your Affiant knows that as part of their normal operation of business, Google stores on their servers the login to the phone and records information about the phone that the user is logging in from.

32. Your Affiant knows that Google, LLC keeps these records and can help identify what Google account used a cell phone by linking the IMEI with the Google Android registration. The IMEI that Google keeps on other devices on a Google account can be traced back to a cellular phone with the help of the cellular providers.

33. Your Affiant knows that Android cell phones can keep a vast amount of data that relates to use of the phone. Most of this data is stored in databases on the phone, and your Affiant is familiar with the structure and basic operation of databases.

34. Your Affiant knows that on the Android operating system, when Google Mobile Services (GMS) applications, like YouTube, Gmail, Maps are opened, the operating system attempts to log the nearest connected cellular tower or WiFi connection. The phone stores this in a database, which can allow an examination to see when certain applications are opened and approximate locations of the device.

35. Your Affiant knows that besides these locations, Google has a service that uploads the location of Android devices to the account that it is registered to. This location history on Google's servers is more accurate as it uses GPS technologies on the device to report back, as opposed to other methods that use cellular towers to approximate locations.

36. Your Affiant knows that a phone carrier also gives users an IMSI (international mobile subscriber identity) that tracks the user across their network. This number can be taken from a phone and given to a wireless phone carrier and they can identify the account associated with that number.

37. Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the search and seizure of the Google, LLC account profile more fully described in Attachment A to seek the information and data more fully described in Attachment B.

38. Supervisory Assistant United States Attorney Jack Burkhead has reviewed and approved this affidavit for the application for a search warrant of the social media profile.

39. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information particularly described in Attachment B.

40. I swear that this information is true and correct to the best of my knowledge.

Ross Zuercher, Special Agent - FBI

SUBSCRIBED and SWORN to before me this 30th day of July, 2018.

United States Magistrate Judge

## ATTACHMENT A

The locations for the authorization to search and seize is described as follows:

The Google, LLC Android profile associated with IMEI – 865882032515558, and/or phone number – 505-582-4555.

8

**ATTACHMENT B**

The property for which authorization to be seized, viewed, and analyzed is sought:

1. Location Data: Any location data currently stored in relation to the email address identified below or associated with the Device ID listed below. This includes any historical physical addresses, latitude and longitude data, estimated latitude and longitude location data, location history, or any other data captured and stored by Google, LLC by the listed Gmail user that would aid law enforcement in establishing historical location information related to the Gmail account use.

2. This would further include all information stored and maintained the "My Activity" associated with the listed Gmail address. Specifically, all information currently stored in reference to the users "Timeline in Google Maps."

3. Location information can be in the form of historical records. Specific to Google, LLC, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information.

4. Account Information: To include all account owner/user identification information, to include all information listed in the "your personal info" within the Google My Account screen. This is to include any stored data that would aid in identifying the user/owner of the listed Gmail account. Any IP addresses related data access, logins, or browsing history, forwarding phone numbers, SMS forwarding numbers, alternative email addresses, and any linked social media accounts would be included in this request.

5. Further included in "account information" is all information currently stored in reference to the users account to include, Google search history, websites visited history, map search history, and any other information associated with location history, device information and recently used devices.

6. Application History: To include all apps downloaded from the Google Play Store to the current devices associated with this Gmail address. This request will include the association of each app to a specific device when available and the date the app was downloaded.

7. Email Content: Any Email Content currently stored in relation to the email address identified below or with the Device associated with account in Attachment A, *and that relate to the alleged crimes involving D.M. as set forth in the attached affidavit.* [RJ] [SCY]

9